**HARRINGTON MANUFACTURING CO.,**
Inc., Plaintiff,

v.

**Idas B. WHITE, Defendant.**

**Civ. A. No. 1443.**

United States District Court,
N. D. Florida,
Tallahassee Division.

Feb. 23, 1971.

Elliott I. Pollock, Washington, D. C., and Robert D. Canada, Tallahassee, Fla., for plaintiff.

H. B. Jacobson, Jr., Washington, D. C., and Marion B. Knight, Blountstown, Fla., for defendant.

## MEMORANDUM DECISION

MIDDLEBROOKS, District Judge.

### PRELIMINARY STATEMENT OF THE ACTION

Plaintiff, Harrington Manufacturing Co., Inc., is a North Carolina Corporation and owner of the United States Patent No. 3,327,745, issued on June 27, 1967. The defendant is a resident of Florida. This is an action for damages to compensate for an alleged infringement, an injunction against further infringement and an award of costs and attorneys' fees. The answer of defendant denies infringement and asserts as an additional defense the invalidity of Patent No. 3,327,745. Additionally, by counterclaim the defendant asks that the Court adjudge that the patent of plaintiff is invalid and that the Court declare the right of defendant to continue his operations without interference by or from plaintiff.

On October 5, 1966, Fred W. Meece and Frank B. Dew made application for a patent of a tree cutter device resulting in the issuance of the patent on June 27, 1967. The rights of the inventors were assigned to the plaintiff. A copy of the patent including the specifications, claims and drawings are appended hereto. There are ten (10) claims set forth in the patent and it is specifically alleged by plaintiff that claims 1, 2, 5, 7 and 10 are infringed by defendant. The claims 1 and 2 are "independent" claims, whereas the remaining claims are "dependent" claims.

### FINDINGS OF FACT

In mid-1965, Meece and Dew made a decision to attempt to improve upon the art of felling trees. They con-

tend that they were unaware at this time that many other persons and companies had already developed "tree shears" for cutting down trees, though they were familiar with the many problems of known tree cutting operations. Although Meece and Dew claim that they were unaware of prior art, because of the obvious similarity of the Meece-Dew shear head to shear heads found in prior art, this Court finds that Meece and Dew were familiar with prior art in the field.

■ The Meece-Dew invention described in the patent in suit involved a combination of structural components to create a hydraulically operated tree shear for mounting on the front end of a tractor or other vehicle. Meece and Dew do not claim to have conceived the idea of providing a tractor mounted tree shear inasmuch as the patent expressly states in Column 1:

> "The basic idea of counting hydraulically driven tree shears on a tractor and using it to cut down trees is now about thirty years old."

The combination arrived at by Meece and Dew includes a "shear head" consisting of a fixed jaw having a shearing blade pivotally mounted adjacent to the jaw for movement toward and away from the fixed jaw under the control of hydraulic cylinders. The "shear head" is mounted on the front end of the tractor. The front end mounting of the shear head is accomplished by the use of a "C-frame" consisting of two parallel supporting arms rigidly interconnected to one another at their front ends by an elongated horizontally disposed beam that extends completely across the front end of the tractor. Each of the parallel supporting arms is pivotally attached to the tractor at its rear end and the "C-frame" is adapted to be moved up and down under the control of a hydraulic cylinder. The shear head is also pivotable being connected to the horizontally disposed beam by pivotable members. This pivotable interconnection between the shear head and the elongated beam

is claimed to be an important feature of the novelty of the invention permitting the arrangement to achieve the "basic concept" which is described as a means for varying the angle of the plane of the jaw members with respect to the beam. Great emphasis is placed upon this "basic concept" and it is said to be adjusted through cooperation between the pivotal interconnection and the "flexible interconnection means." In the drawings contained in the patent, the "flexible interconnection means" are shown to be a cable and a chain. Other alternative flexible interconnection means are described in the specifications and the claims. It is noted that in claim 10 of the patent, hereinafter referred to as the "Meece patent", that one of the alternative means "comprises an adjustable hydraulic cylinder."

■ The claims in suit constitute two independent claims [1] and three dependent claims.[2] The independent claims contemplate combinations of structures comprising a particular type of shear head, i. e., having a pair of fixed jaw members, a cutting blade pivotally mounted with respect to the fixed jaw members and a blade for moving the cutting blade relative to the jaw members. In addition, the claimed combinations of structure include a special front mounting assembly as was more fully described in paragraph 2 of the Findings of Fact. The claims in suit in addition to defining in some detail the special shear and special mounting arrangement employed, further define a particular structural arrangement for interconnecting the defined shear head to the defined mounting structure. This system functions as the result of interaction between the pivotal connections and the "flexible interconnection means."

■ The combinations recited in claims 1 and 2 are defined in further detail in claims 5, 7 and 10:

(a) Claim 5, which depends from claim 2, states that the means for rais-

---

1. Claims 1 and 2.

2. Claims 5, 7 and 10.

ing and lowering the beam comprises a hydraulic cylinder and piston.

(b) Claim 7, which also depends from claim 2, states that the "flexible interconnection means" includes an upstanding post and that "a flexible element" extends between this upstanding post and the fixed jaw of the shear head.

(c) Claim 10 depends from claim 1 and says that the "flexible interconnection means" comprises "an adjustable hydraulic cylinder."

■ It is plaintiff's position that the combination of elements defined in each of claims 1 and 2 and the more detailed combinations of claims 5, 7 and 10 are embodied in the accused White tree shears.

■ In the late summer of 1965, Meece and Dew began building a tree shear device in an attempt to find an effective means of cutting down trees. By September, 1965, they had completed and had in use two tree shears. This initial device included a conventional cutter head or shear head in which the cutting blade was hydraulically pivoted with respect to a pair of fixed jaws. Additionally, the shear head was pivotally attached to a cross-beam between a pair of parallel arms in the form of a C-frame and was supported off the ground by a chain.

■ Meece explained at trial that when he and Dew adopted the chain as the support linkage for the shear head in their tree shear, they did not want a rigid connection. They wanted a support linkage which would "give". The "flexible interconnection means" of the Meece patent tree shear was designed to perform at least two functions: to permit free pivotal movement of the shear head and to serve to limit the downwardmost position of the arc through which the shear head could move.

■ Meece and Dew had by December, 1965, built a third tree shear which closely resembled the initially built device except that the chain supporting linkage was replaced by a combination cable and steel bar with adjustment holes. Plain-

tiff, having learned of the Meece-Dew shear, entered into a contract in February, 1966, with Meece and Dew whereby plaintiff would manufacture and sell this device and attempt to patent it. By April, 1966, plaintiff commenced the manufacture and sale of the tree shear which was substantially identical to the Meece-Dew machine and included the combination cable and steel bar with adjustment holes as the supporting linkage between the shear head and mounting assembly to provide a floating arrangement for the shear head.

■ After manufacture of the shear had been commenced in February, 1966, plaintiff by April and May, 1966, began shipment and delivery of actual equipment. In June, 1966, the shear had reached northwest Florida and was displayed in Panama City, Florida.

■ For many years defendant White, a machine shop operator in Blountstown, Florida, had designed and built for the logging industry numerous pieces of equipment including hydraulically operated equipment.

■ In May, 1966, defendant met with certain third parties who requested that he build several hydraulically operated tree shears which could be mounted on the front end of tractors. Defendant then started designing and building the requested hydraulically operated tree shear which was field-tested on July 30, 1966. Simultaneously with construction of this tree shear defendant was building another device which was demonstrated in Macon, Georgia, in late August, 1966. These devices were soon followed by a third device in September, 1966, which was sold by defendant to John Davis who accepted on behalf of his company, Georgia Timberlands.

■ The defendant's tree shear included a conventional shear head which was pivotally mounted to the tractor C-frame. Although his first unit included three chain links as part of the support linkage, defendant, upon field-testing the machine, found the chain links unsatisfactory and eliminated the flexible com-

ponent in the support linkage and replaced it with a rigid interconnection established by a double acting hydraulic cylinder as the sole element of the support linkage.

■ As constructed the tree shear of the defendant White is approximately one half the weight of the tree shear of the plaintiff.

■ Defendant gave four reasons for his adopting a double acting hydraulic cylinder as the sole element of the supporting linkage. First, he wanted a complete power controlled machine which could apply power to any part of the tree shear unit and be controlled from the vehicle cab. Secondly, he wanted the tree shear to fold up and make the entire vehicle shorter in length for increased maneuverability. Next, he wanted to be able to apply a downward pressure to the shear head in order to crush brush, snow, etc. around the tree trunk so that the tree could be sheared as close to the earth's surface as possible. Lastly, he wanted to provide means to move readily the center of gravity of the entire machine as far back as possible for travelling purposes.

■ The defendant's tree shear was also equipped with "toter brackets" which are objects welded on the C-frame and serve to limit the downwardmost position of the arc through which the shear head can pivot. The shear head is designed to engage the "toter" or stop brackets before the piston head bottoms in the support cylinder. This arrangement insures that the shear head is locked when in its downwardmost position by reason of the downward force to the shear head applied by the support cylinder against the brackets; too, it provides a safety feature in that the weight of the shear head is carried by the "toter brackets" and not by the double acting hydraulic cylinder.

■ After the first field demonstration of the White tree shear in late July, 1966, Joseph Harrington, President of plaintiff corporation, learned of defendant's development work and in the following month he visited defendant's shop in Blountstown, Florida. During this visit defendant explained his tree shear to Harrington who in turn requested defendant to build hydraulic cylinders to be used by plaintiff to actuate the blade in its tree shear. Both parties stated their intention to secure patent rights on their respective tree shear machines.

■ During this time plaintiff had photographs taken of the first White tree shear and one of plaintiff's agents observed the construction of some of defendant's first tree shear machines. The application which issued into the Meece patent was not filed until some forty days after the first Harrington-White meeting and some time after Harrington had full disclosure of defendant's tree shear.

■ Contact between plaintiff and defendant did not cease with the August, 1966, meeting. Other meetings culminated in plaintiff's attempt to purchase the White invention and patent rights.

■ In 1968, White sold his invention and patent rights to Timberjack Machines, Ltd. At the time the White contract was negotiated and signed, Timberjack was aware of and had evaluated the Meece patent in suit.

■ In the fall of 1968, plaintiff learned that defendant had sold his invention and patent rights to another company. Plaintiff then filed this lawsuit and for the first time began building a tree shear which included a double acting hydraulic cylinder in place of the flexible cable for the supporting linkage.

■ The Examiner in the United States Patent Office who considered and approved the Meece patent application also considered and approved the White patent application. The Meece patent was considered by the Patent Office Examiner before he granted the White patent.

■ The two Busch patents and the two McFaull patents were before the Examiner during the prosecution of the

Meece patent application. The Examiner found that the claims in suit were not anticipated by or rendered obvious to any of these patents taken alone or in any logical combination with one another.

In tree-cutting systems constituting the prior art at the time the Meece invention was conceived, there was no combination of shear head, mounting structure and interconnection of the two which achieved the same operative result with the degree of simplicity, efficiency and commercial success as did the patent in suit. In short, none of the arrangements contained in those patents either disclosed as prior art to the Patent Examiner or cited as references by him contemplate a pivotal mounting of the shear head used in interaction with a "flexible interconnection means" as used in the Meece patent.

The defendant tree shear employs a double acting hydraulic cylinder as the sole element of the supporting linkage between the shear head and mounting assembly. The testimony of the qualified expert witnesses establishes by a preponderance of the evidence that the double acting hydraulic cylinder and circuit as used in the White tree shear is a rigid and not a flexible interconnection. One of plaintiff's own experts admitted that a double acting hydraulic cylinder in a properly designed circuit is "locked in position."

Even though such factors as cavitation and entrained air may be involved in double acting hydraulic cylinders and circuits, the preponderance of the evidence established that the presence of these factors is undesirable and is avoided in properly designed hydraulic systems. The Court finds that the small degree of movement which might be encountered as a result of these factors in the double acting hydraulic cylinder support linkage of defendant's tree shear would be insufficient to allow the shear head to "freely move" or "give" as required for the "flexible" support linkage of the Meece patent and the Meece patent claims.

Plaintiff claimed that defendant copied the Harrington TF–1 tree shear. Even if White did copy the work of Meece and Dew in White's first two shears, the White shear as finally developed has a rigid connecting member. The earlier White shear was not patented by White.

## CONCLUSIONS OF LAW
## VALIDITY

This Court has jurisdiction of the subject matter in suit and over the parties. Title 35, United States Code, Section 281; Title 28, United States Code, Sections 1338(a) and 1400(b).

The plaintiff, Harrington Manufacturing Company, Inc., is the owner of the entire right, title and interest in and to the patent in suit and has the right to maintain suits for infringement of such patent.

The paramount issues for decision by the Court in this case are simply whether United States Patent No. 3,327,-745, owned by plaintiff is valid; and if valid, if it has been infringed by the tree shear made and sold by defendant. It has come to be recognized, however, that of the two questions, validity has the greater public importance. Sinclair and Carroll Co., Inc. v. Interchemical Corp., 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644 (1945). For this reason this Court considers initially the issue of validity.

In Beckman Instruments v. Chemtronics, 428 F.2d 555, 561 (5th Cir. 1970), cert. denied, 400 U.S. 956, 91 S. Ct. 354, 27 L.Ed.2d 264 (1970), the Court stated:

"The three germinal tests of patent validity are utility, novelty, and non-obviousness. * * *. Section 102, which pertains to novelty, requires that the patentee be the original inventor of the object claimed in his patent, and also that the invention not have been known or used by others before his discovery of it. Thus one obviously cannot be the original inventor if someone else has described or used the subject matter of the claims before the earliest moment to which he can

trace his invention. * * *. Furthermore the prior art is to be considered as covering all uses to which it could have been put. Thus a patent claiming a device that has already been put to use, albeit in a different manner, is invalid; in order to be valid over the prior art, it must claim not novel use, but novel conception. * * *."

■ ■ Under Title 35, United States Code, Section 282, the patent in suit is presumed to be valid. In the absence of clear and convincing evidence to the contrary, the law presumes that the Patent Office correctly issued the patents. Spee-Flo Mfg. Corp. v. Braniff Airways, Inc., 430 F.2d 74 (5th Cir. 1970); Stamicarbon N. V. v. Escambia Chemical Corp., 430 F.2d 920 (5th Cir. 1970); Hunt Industries, Inc. v. Fibra Boats, Inc., 299 F.Supp. 1145 (S.D.Fla. 1969).

■ ■ The burden of invalidity rests on the party asserting it. Title 35, United States Code, Section 282; Hunt Tool Co. v. Lawrence, 242 F.2d 347, 351 (5th Cir. 1957).

■ In *Spee-Flo Mfg. Co.*, supra, 430 F.2d at 81, it was said that:

"[u]nless the subject matter of a patent involves both novelty and invention, the patent is invalid, for mere novelty without invention is insufficient."

■ ■ The patent in suit is not anticipated by the prior art. In this litigation the most pertinent prior art includes the Busch patents, Nos. 2,876,-816 and 3,059,677, the McFaull patents, Nos. 2,697,459 and 2,565,252, the Burke patent, No. 638,553 and the French patent, No. 1,313,995. All of these patents were before the Examiner in the United States Patent Office during the prosecution of the Meece application. The Examiner in his allowance of the claims was of the view that the claims in suit were distinct from these four references and that they were not anticipated by or rendered obvious by any of these patents. In this light, the presumption of validity is strengthened where it appears that the Patent Office fully considered and distinguished the prior art patents principally relied upon as anticipation. Jeoffroy Mfg. Inc. v. Graham, 219 F.2d 511 (5th Cir. 1955).

■ Defendant has failed to overcome the presumption of validity by clear and convincing evidence to the contrary.

■ It should be emphasized that the invention in this suit involves a combination of structures. "It is well settled that a combination is patentable, though each of its constituent elements was well known in the prior art, if the combination produces a new and useful result and would not have been obvious at the time of the invention to a person having ordinary skill in the art. * * " Williams Bit and Tool Co. v. Christensen Diamond Produce Co., 399 F.2d 628, 632 (5th Cir. 1968).

■ ■ In examining patent claims the Court should "construe them narrowly so as to avoid the prior art if such a construction can reasonably be adopted." *Beckman Instruments*, supra, 428 F.2d at 561.

■ ■ Although certain constituent elements of the Meece patent were known in the prior art, the flexible interconnection means of the Meece patent produced a new and useful result and did not anticipate the prior art. It is this act of selection and arrangement of elements which, if it overcomes defects in the prior art, produces the invention and renders it novel. B. G. Corp. v. Walter Kidde & Co., 79 F.2d 20 (2d Cir. 1935).

■ The Court in Johns-Manville v. Cement Asbestos Products, 428 F.2d 1381, 1385 (5th Cir. 1970), in reaching its determination that the patent in suit was rendered obvious by the prior art said:

"In Graham v. John Deere Co., 1966, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 * * * the Court construed the language of 35 U.S.C.A. § 103 to mean that a patent may not be obtained, although the invention has not

been identically disclosed in the prior art, when the differences between the patent and the prior art are such that they would have been obvious to a person having ordinary skill in the art to which the subject matter pertains. * * *.

"In determining the legal question of the validity or invalidity of a patent due to obviousness, *Graham* requires that the Court establish the scope and content of the prior art, the differences between the prior art and the claims at issue, and the level of ordinary skill in the pertinent art at the time of the invention under attack."

■ ■ The Meece invention at the time of its inception exceeded the level of ordinary skill in the pertinent art and was an unobvious advancement in the art. When compared to the prior art the Meece invention experienced greater commercial success than any of its forerunners had enjoyed. The Court may consider this circumstance in its determination of whether the patent in suit is rendered invalid as obvious. Graham v. John Deere, supra; Kardulas v. Florida Machine Products Co. et al., 438 F.2d 1118, 5th Cir. 1971.

■ This Court concludes that the Meece patent is valid and is neither anticipated by nor rendered obvious by the prior art.

### INFRINGEMENT

■ The tree shear disclosed in the Meece patent incorporates a supporting linkage which interconnects the shear head and the mounting assembly. As illustrated in the Meece patent drawings, this supporting linkage can be either (1) a chain or (2) a cable and bar combination. The claims of the Meece patent in subsection (f) of Claim 1 and subsection (d) of Claim 2 define this supporting linkage as a "flexible interconnection means" and then recite specific functions to be performed by the supporting linkage in the claimed combination. Accordingly, the first inquiry on the issue of infringement is whether the

word "flexible" in the phrase "flexible interconnection means" should be given its normal and customary meaning and thereby preclude the Meece patent claims from encompassing a rigid supporting linkage, such as a double acting hydraulic cylinder as used in the White tree shear. A second inquiry, independent of the first, is whether the double acting hydraulic folding cylinder of the White tree shear performs the specific functions required by 1(f) and 2(d) of the Meece patent claims for the supporting linkage.

■ ■ The issue of patent infringement is a question of fact. Sterner Lighting, Inc. et al. v. Allied Electrical Supply, Inc., 431 F.2d 539 (5th Cir. 1970); United States Industries, Inc. v. Otis Engineering Corp., 254 F.2d 198 (5th Cir. 1958). The burden of proof in connection with the issue of patent infringement rests upon the patent owner to establish that the accused structure falls within the scope of the patent claims. Phillips Petroleum Co. v. Sid Richardson Carbon & Gasoline Co. et al., 416 F.2d 10 (5th Cir. 1969); Corning Glass Works v. Federal Glass Co., 239 F.2d 674 (6th Cir. 1956); Marvin Glass & Associates v. Sears, Roebuck & Company, 318 F.Supp. 1089 (S.D.Tex.1970).

■ ■ In order for there to be infringement of a combination patent claim, such as the Meece patent claims in suit, the accused structure must include each and every element or its equivalent described in the patent claim. Reed v. Parrack, 276 F.2d 784 (5th Cir. 1960); Stewart-Warner Corp. v. Lone Star Gas Company et al., 195 F.2d 645 (5th Cir. 1952).

■ ■ A patent which has no pioneer status but is at most an improvement patent in a crowded art is entitled to protection only within the narrowest limits. Stewart-Warner Corp. v. Lone Star Gas Co., supra. See also Big "G" Distributing Co. v. Air Cleaner Service Co., 179 F.2d 122 (5th Cir. 1950).

■ ■ Patents in a crowded art are limited ones and the claims thereof

must be narrowly construed. Sterner Lighting, Inc. v. Allied Electrical Supply, Inc., et al., supra, 431 F.2d at 544; Texas Pit Service, Inc. v. Brackett, 272 F.2d 882 (5th Cir. 1959); Stewart-Warner Corp. v. Lone Star Gas Company, supra. The Meece patent being in a crowded art must be narrowly construed.

■ ■ Patents on simple combinations are not easily infringed. Foster Cathead Co. v. Hasha, 382 F.2d 761 (5th Cir. 1967); Texstream Corp. v. Blanchard, 352 F.2d 983, 986 (5th Cir. 1965), cert. den. 387 U.S. 936, 87 S.Ct. 2064, 18 L.Ed.2d 1000 (1967); Stewart-Warner Corp. v. Lone Star Gas Company, supra.

■ ■ Words used in a patent should be given their ordinary and accustomed meaning unless it specifically appears from the patent that the inventor attached some different specific meaning to the word or words. Universal Oil Products Co. v. Globe Oil Refining Co., 137 F.2d 3 (7th Cir. 1943), affd. 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399 (1944); Aircraftsmen, Inc. v. Aircraft Equipment Company, D.C., 247 F.Supp. 469, 477–478, affd. per curiam 383 F.2d 988 (5th Cir. 1967); Godfrey L. Cabot, Inc. v. J. M. Huber Corporation, 127 F.2d 805, 807 (5th Cir. 1942). The Court concludes that the word "flexible" as appears in the Meece patent and as included in the phrase "flexible interconnection means" should be given its ordinary and accustomed meaning. Accordingly, the Meece patent claims in suit all describe tree shears in which the support linkage is flexible or allow the shear head to freely move. The claims are not broad enough to include tree shears in which the support linkage is substantially rigid.

■ ■ Patent claims should be interpreted so as to describe the embodiments of the patented subject matter illustrated in the patent drawings rather than to describe subject matter

not illustrated. Bocciarelli v. Huffman, 232 F.2d 647, 43 CCPA 874 (1956); Rule 83, Patent Office Rules of Practice. The fact that the Meece patent drawings do not include an illustration of a double acting hydraulic cylinder as the support linkage is an indication that the Meece claims were never intended to include such structure.

■ ■ The word "comprises", when used in a patent claim such as the Meece patent claim 10, is synonymous with the word "includes" and does not preclude the presence of other elements as part of the described structure. In re Horvitz, 168 F.2d 522, 35 CCPA 1239 (1948); In re Cone, 121 F.2d 470, 28 CCPA 1282 (1941). See also Robie v. Carlton, 171 F.2d 310, 36 CCPA 739 (1948).

■ ■ The rules of the United States Patent Office have the force of law to the extent they are not inconsistent with the express provision of the patent statutes, and failure to comply with the rules is unlawful. Potter Instrument Co., Inc. v. Mohawk Data Sciences Corp., 309 F.Supp. 866 (S.D. N.Y.1970); See also Piel v. Falkner, 426 F.2d 412 (CCPA 1970); Land v. Dreyer, 155 F.2d 383, 33 CCPA 1108 (1946). Rule 83, Patent Office Rules of Practice requires that the patent drawings show every feature specified in the claims. Since the "adjustable hydraulic cylinder" recited in Meece patent claim 10 is not illustrated in the patent drawings, claim 10 must be invalid unless interpreted to include a flexible element in combination with the hydraulic cylinder as the support linkage.

■ ■ The claims of a patent should be construed in light of the Patent Office prosecution of the application which matured into the patent. Graham v. John Deere Co. of Kansas City, supra; Waldon, Inc. v. Alexander Mfg. Co., 423 F.2d 91 (5th Cir. 1970); Bros. Inc. v. W. E. Grace Mfg. Co., 351 F.2d 208, 213 (5th Cir. 1965).

Patents should be construed by the courts to be valid, if possible. In order to do so, a court may construe the patent claims narrowly so as to avoid the prior art. Sterner Lighting, Inc. v. Allied Electrical Supply, Inc., supra; Beckman Instruments, Inc. et al. v. Chemtronics, Inc., et al., supra; Marvin Glass & Associates v. Sears, Roebuck & Company, supra. But in so doing, a patent claim cannot be twisted one way to avoid the prior art and another way to establish infringement. White v. Dunbar, 119 U.S. 47, 7 S.Ct. 72, 30 L.Ed. 303 (1886); Permo, Inc. v. Hudson-Ross, Inc., 179 F.2d 386 (7th Cir. 1950); Sterner Lighting, Inc. v. Allied Electrical Supply, Inc., supra.

A patent specification cannot expand the scope of the patent claims. McClain v. Ortmayer, 141 U.S. 419, 424, 12 S.Ct. 76, 35 L.Ed. 800 (1891). Accordingly, the reference to a "hydraulic cylinder" at column 4, lines 72–74 of the Meece patent specification cannot be relied upon to expand the scope of the phrase "flexible interconnection means" to include a rigid interconnection such as a double acting hydraulic cylinder.

The Court concludes that when considering the evidence at the trial, the prior art, the prosecution history of the Meece patent and the antithetical qualities of rigidity and flexibility, a double acting hydraulic cylinder is a rigid and not a flexible connection. Schriber-Schroth Co. v. Cleveland Trust Co., 305 U.S. 47, 58, 59 S.Ct. 8, 83 L.Ed. 34 (1938); Baldwin-Lima-Hamilton Corp. v. Hi-Way Equipment Co., 250 F.Supp. 574 (S.D.Tex.1965).

Where a patentee elects to define an element of his claimed combination in terms of a "means" plus a function (as in the Meece claims "flexible interconnection means") it is essential for infringement that the corresponding means of the accused structure perform the same function in the same way to obtain substantially the same results. Foster Cathead Co. v. Hasha, supra; McCutchen v. Singer Co., 386 F.2d 82 (5th Cir. 1967); Up-Right, Inc. v. Safway Products, Inc., 315 F.2d 23 (5th Cir. 1953). The Court concludes that the White cylinder does not perform the functions required for the "flexible interconnection means" of the Meece patent claims.

The double acting hydraulic cylinder in the White tree shear structure is not equivalent to the "flexible interconnection means" of the Meece patented tree shear and, therefore, there can be no infringement. General Steel Products Company v. Lorenz, 204 F. Supp. 518, 531–533 (S.D.Fla.1962) affd. 337 F.2d 726 (5th Cir. 1964); McCutchen v. Singer Company, supra; Signal Mfg. Co. v. Kilgore Mfg. Co., 198 F.2d 667 (9th Cir. 1952). See also Baldwin-Lima-Hamilton Corp. v. Hi-Way Equipment Co., supra.

The grant of a subsequent patent carries weight in determining non-equivalence and raises a presumption of non-equivalence. Kokomo Fence Machine Co. v. Kitselman, 189 U.S. 8, 23, 23 S.Ct. 521, 47 L.Ed. 689 (1902); Edwards v. Johnston Formation Testing Corp., 44 F.2d 607, 614 (S.D.Tex. 1930), affd. 56 F.2d 49 (5th Cir. 1932). See also Walker on Patents (Deller's Ed. 1937), § 506, pp. 1758–1764.

This Court concludes that the tree shear patented by defendant White has not infringed any of the Meece patent claims, 1, 2, 5, 7 and 10. The accused machines lack that identity of means and identity of operation which must be combined with identity of result to constitute infringement. Kokomo Fence Machine Co., supra, 189 U.S. at 24, 23 S.Ct. 521.

Defendant is entitled to a judgment holding there has been no infringement by him of the Meece patent and judgment will be entered accordingly. Costs will be taxed upon application.

The Court finds it unnecessary to rule upon the counterclaim of defendant.

APPENDIX

June 27, 1967          F. W. MEECE ETAL          3,327,745

TREE CUTTER DEVICE

Filed Oct. 1, 1966                              3 Sheets—Sheet 1

FIG. 1.

FIG. 2.

INVENTORS

Fred · W. Meece &

Frank B. Dew

EX. NO.

For Identification

[A3726]

1356

FIG. 3.

FIG. 4.

FIG. 5.

INVENTORS
Fred W. Meece &
Frank B. Dew

[A3725]

June 27, 1967          F. W. MEECE ETAL          3,327,745
                        TREE CUTTER DEVICE

Filed Oct. 5, 1966                        3 Sheets—Sheet 3

FIG. 7.

FIG. 8.

FIG. 6.

INVENTORS
Fred W. Meece &
Frank B. Dew.

[A3727]

1358

United States Patent Office
3,327,745
Patented June 27, 1967

3,327,745

## TREE CUTTER DEVICE

Fred W. Meece, Washington, and Frank B. Dew, Plymouth, N. C., assignors to Harrington Manufacturing Company, Lewiston, N. C., a company of North Carolina

Filed Oct. 5, 1966, Ser. No. 584,516
10 Claims. (Cl. 144—34)

The lumber and pulpwood industries require large quantities of logs each day in order to maintain continuous operation. At one time all of these logs were supplied by crews of men with axes and saws working their way through a tract of woodland. Within the last twenty years, chain saws operated by small gasoline motors were introduced and this greatly reduced the actual physical labor involved in felling a tree. Although a great number of chain saws are still in use by lumbermen, the diminishing supply of labor and its increasing cost have forced the lumber and pulpwood industries to look for other means for felling trees at less cost and greater speed. The trend now clearly seems to be toward cutting devices mounted on tractors or other vehicles, and powered by one or more hydraulic pistons. One such tractor-mounted cutting device can do the work of many men equipped with chain saws. The following patents are representative of those that have issued since 1940 on tree cutting devices mounted on tractors or similar vehicles: 2,214,334, 2,228,635, 2,493,696, 2,529,934, 2,565,252, 2,697,459, 2,751,943, 2,820,493, 2,845,101, 2,876,816, 2,955,631, 2,981,301, 3,059,677, 3,122,184, 3,183,949, 3,183,952, 3,183,953, 3,183,954, 3,196,726, 3,196,911, and 3,-230,988.

Devices of the above type have the advantage that (a) the tractor can move through heavy underbrush more quickly and easily than men with chain saws, (b) tree felling is less at the mercy of unfavorable weather and soil conditions, (c) the comparatively delicate and erratic performance of chain saws is avoided, and (d) the movement of the tractor through a wooded area in the normal course of its tree felling operations automatically smooths the way for subsequent log removing operations by crushing down the heavy underbrush which often surrounds the trees.

Since the basic idea of mounting hydraulically driven shears on a tractor and using it to cut down trees is now about thirty years old (see Knight Patent 2,-214,334), the inventors in this field have primarily directed their attention toward solving certain problems associated with this basic operation.

One problem which has not been solved thus far is the problem of being able to cut trees so that the stump will follow the contour of the ground when the tree is on an uphill slope or on a downhill slope. This problem has probably escaped the attention of many inventors because so many logging operations are carried out on essentially level ground. However, the problem is an important one since with the increasing use of wheeled or tracked vehicles to remove logs after they are felled, every precaution must be taken not to leave stumps that will obstruct or disable the wheels or tracks of such vehicles. When the wheel or track of a log hauling vehicle is disabled by a protruding stump, the entire logging operation is often halted, which is both expensive and wasteful of machines and manpower.

Furthermore, even ground which seems to be quite level, is not really level insofar as a tractor is concerned because the presence of fallen trees, stump holes, old stumps and heavy brush in the area where the tractor is to cut timber in effect makes the ground quite unlevel. In fact, due to the presence of fallen trees, stump holes, old stumps and heavy brush, the tractor is probably not level 50% of the time.

The present invention relates to an arrangement for use primarily on tractors whereby, through the use of fluid operated shears, it becomes possible to

station the shears at any desired point near the lower part of a tree and thereafter operate the shears to cut through the trees at or very near the level of the ground so that the top surface of the remaining stump can be made substantially parallel to the ground regardless of the contour of the ground and regardless of the presence of fallen trees, stump holes, old stumps and heavy brush. The cutting device of this invention permits better adjustment of the cutting blades angle both before and during the cutting operation. Trees may be cut or sheared closer to the ground than by any other means. This results in more wood utilization and a better quality of wood.

When a tractor equipped with the tree-cutting device of this invention is also equipped with a heater or an air-conditioner, tree cutting work can be carried on during the entire year at peak efficiency, regardless of the weather, enabling an operator to cut many times as much, even in heavy underbrush, as his walking chain-saw-carrying counterpart. There is no need to postpone tree cutting operations until the underbrush is cleared out. The present invention takes most of the physical labor out of stumping and reduces the hazards of nature. It also permits a wider range of personnel to be used for the stumping work. A new operator can directionally fell trees with very little training. The fact that the present tree cutting device cuts stumps so close to the contour of the ground avoids the possibility that skidding and reseeding equipment which is later used over the cut area will be damaged by protruding stumps. The tree-cutting device of this invention delivers *many times* the production possible from a man with a chain saw.

A primary object of this invention is to provide a mounting for a timber shear device which is adjustable to position the blade of the timber shear device parallel to the ground, regardless of the slope of the ground.

A further object is to provide a timber shear device, which may be adjusted both as to the height and the slope of the ground.

Another object of this invention is to provide a cutting attachment of the type described which is suitable for ready mounting and removal from conventional tractor-type vehicles, such unit having blade elements to sever trees and guide elements to control the direction or fall of trees and eliminate or reduce the risk of damage to the vehicle or injury to its operator.

Still another object of this invention is to provide a cutter of the type described, which is simple in operation, economical of manufacture and sufficiently rugged to withstand the severe conditions resulting from its field of employment.

With the foregoing and other objects in view, all of which will become clearer as the description proceeds, the invention consists of certain novel details of construction and combinations of parts hereinafter more fully described and pointed out in the claims, it being understood that changes may be made in construction and arrangement of the parts without departing from the spirit of the invention as claimed.

In the accompanying drawings preferred forms of the invention have been shown, in which:

FIGURE 1 shows a perspective view of our improved timber shear mounting structure;

FIGURE 2 is a partial plan view thereof with the blade open;

FIGURE 3 is a partial plan view thereof showing the blade closed;

FIGURES 4 and 5 are side elevations along 4—4 and 5—5 respectively of FIGURE 3;

FIGURE 6 is a side elevation of another embodiment of the invention; and

FIGURES 7 and 8 are side elevations showing how the timber shear of this invention would work on inclined slopes.

Referring now more particularly to the drawings, wherein like numerals refer to like parts in the various views, 1 represents a conventional tractor upon which

the timber shearing device of this invention is mounted.

The main element of the shearing device is an elongated blade member 7 that is preferably generally L-shaped in overall plan view, although the precise shape is not critical. One end of (i. e. the inner end) said blade member 7 is mounted on a pivot pin 6 so that the blade can be pivoted through a limited arc. The pivot pin 6 is securely fixed between two fixed jaw members 3 and 4 that may be considered as generally L-shaped. The jaw members 3 and 4 are preferably provided with teeth to assist in gripping the tree that is to be cut.

The jaw members 3 and 4 are disposed in a generally parallel relationship to each other and are held apart a fixed distance by one or more spacer means 5 of the type shown in FIGURES 4 and 5.

A pair of fluid operated cylinder and piston means 10 are shown pivotally connected to one end of the fixed jaw members 3 and 4 by means of pins 11 and also pivotally connected to an extension 8 welded on the outer end of the blade member 7 by means of pins 9. If desired, a single cylinder and piston means can be used rather than the two shown. In operation, the cylinder and piston means 10 (when supplied with fluid pressure) move the blade 7 toward and to a limited extent between fixed jaws 3 and 4 to thereby cut through a tree trunk.

Referring now to the support arrangement, it will be noted that two generally parallel supporting arms 15 and 15' have their front ends attached to a beam 14 at spaced apart points and the rear ends supporting arms 15 and 15' are adapted to be pivotably attached to suitable pivot points 16 and 16' located on the sides of vehicle 1.

A lifting means in the form of a hydraulic cylinder 19 is provided so that by having its upper end connected to the vehicle 1 and its lower end connected to the beam 14, the beam can be suitably raised or lowered. FIGURE 6 shows another arrangement wherein the beam 14 can be positioned at any desired level by a cylinder 28 mounted at an angle to the horizontal and which is secured by a bolt 29 to the side of the tractor body, and by pins 30 to the beam 14.

An important feature of novelty of this invention is the particular way in which the jaw members are connected to the beam 14. We have discovered that these jaw members should first of all be mounted for vertical pivotal movement with respect to the elongated horizontally disposed beam 14, preferably by means of a plurality of pivot members 13. In addition to said pivotal mounting, there should be a flexible interconnecting means between said jaw members and said beam 14, such flexible interconnecting means serving to establish the maximum arc through which the jaw members can freely move with respect to the beam 14.

One form of a suitable flexible interconnecting means is shown in FIGURES 1–5, and is seen to consist of an upstanding post member 25 located on beam 14, cable 22 and a bar 23 (having a plurality of holes 24 therein) that extend between post member 25, and a lug 21 located on the upper fixed jaw 3. The holes 24 in bar 23 and a series of holes 40 in post member 25 can be aligned and a bolt 27 inserted therethrough so as to establish the maximum extent to which the fixed jaws 3 and 4 can pivot about the beam 14.

FIGURE 6 shows another flexible interconnecting means comprising an upstanding post 31 located on beam 14 that has a tubular bar 32 extending therefrom. One end of chain 33 is connected to bar 34 on the upper jaw member 3, and at the other end is brought over the tubular member 32. The end of the chain has a hook 35 which may be connected to any desired link. The maximum extent to which jaw members may pivot with respect to the beam 14 may be adjusted by unhooking the chain at hook 35, setting the jaws to the desired position and then pulling the chain taut and hooking it.

With the above described arrangements, an operator usually first adjusts the level of the shear blade with respect to the ground by first supplying fluid pressure to cylinder 19 so as to raise or lower the beam 14 to the desired level. The operator then checks to make sure that the cable 22 (or chain 33) has enough slack in it so that that jaws and blade can rest either on the ground near the base of the tree or only a short distance above the ground and parallel to it. If the jaws and blade do not rest in the aforesaid desired positions, then the operator should adjust the cable or chain until there is sufficient slack to permit these positions. As a general rule, the operator can operate over a considerable portion of a wooded tract by providing sufficient slack so that the plane of the fixed jaws can drop freely to the position shown in FIGURE 7 (i. e. up to about 45°) or raise to about 45° as is shown in FIGURE 8.

It is thus seen that the blade is able to cut off a tree so that the surface of the remaining stump conforms to the contour of the ground and does not project above the ground to a sufficient degree to present an obstacle to the movement of other vehicles.

The aforesaid flexible interconnecting means of this invention not only permits the blade and jaws to follow the contour of woodlands with an undulating surface, but it also affords a measure of protection to the jaws and blade after the tree is cut and is falling. In other words, falling trees topple until the top of the tree hits the ground, but when the top of the tree hits the ground, the severed trunk portion often momentarily is fulcrumed into the air by virtue of the branches on the tree, and immediately thereafter the raised severed trunk portion comes slamming back down to earth again. More often than not, when the severed trunk slams down, it slams down on top of the jaws and the blade. If the jaws and blade were not pivotally and flexibly interconnected as we have described above, the force of the descending trunk could easily break the blade and/or jaws. Our arrangement provides some "give" so that even if the severed trunk slams down on the jaws and blade, this force is largely transmitted to or absorbed by the ground upon which the jaws and blade are resting by virtue of the pivotal connection to beam 14 and the flexible interconnecting means. Our invention is therefore quite valuable in that it has a built-in safety feature that reduces wear and tear on the timber shear and avoids many costly disablements of the machine that might otherwise occur.

FIGURES 7 and 8 illustrate more clearly how the present invention enables a timber shear to cut trees substantially parallel to the ground regardless of whether the tree is over the crest of a hill with respect to the tractor or across a small valley with respect to the tractor. (The blade 8 and piston 10 would usually be flat on the ground in actual practice, but for the purpose of clarity of illustration, the blade 8 and the piston 10 are shown raised slightly above the ground.) In FIGURE 7 the chain or cable 22' is shown as being slack and in FIGURE 8 taut. However, it would also be possible to have the chain or cable 22' slack in the FIGURE 7 arrangement and taut in the FIGURE 8 arrangement. Also, whereas a cable 22 has been shown in FIGURES 1–5, a chain 33 in FIGURE 6, and a chain or cable in FIGURES 7 and 8, the basic concept is that of having a means for varying the angle of the plane of the jaw members with respect to the beam 13. Consequently, no invention would be involved in replacing flexible cable 22 or chain 33 with an obvious equivalent, such as a hydraulic cylinder or in using a cable or chain in conjunction with a flexible cylinder or heavy spring, or in using a chain or cable in conjunction with a turnbuckle, or a piston with a "floating circuit."

It is thus seen that the present invention provides a hydraulically operated tree-cutting device which can easily be mounted on the front end of a crawler-type tractor and which can utilize the existing hydraulic system of the tractor

for both moving the blade and positioning the blade with respect to the tree to be cut. The special way in which this cutting unit is mounted permits the operator to approach very closely to a tree and to cut off the tree cleanly at virtually ground level regardless of the incline of the ground.

While the invention has been particularly described in connection with trees, it will be understood that it is also applicable to heavy brush and foliage that are not exactly classified as trees. Also, whereas the invention has been particularly described in relation to tractors, the invention could just as well be used with a number of other types of vehicles that are not strictly characterized as tractors.

In conclusion, while there has been illustrated and described some preferred embodiments of our invention, it is to be understood that since the various details of construction may obviously be varied considerably without really departing from the basic principles and teachings of this invention, we do not limit ourselves to the precise constructions herein disclosed and the right is specifically reserved to encompass all changes and modifications coming within the scope of the invention as defined in the appended claims. Having thus described our invention, what we now claim as new and desire to secure a United States Letters Patent on is set forth in the following claims.

What is claimed is:

1. An improved tree cutting device including:

(a) a cutting blade,

(b) one end of said cutting blade being pivotably mounted with respect to a pair of fixed jaw members,

(c) fluid operated cylinder and piston means interconnecting said pair of jaw members and said cutting blade,

(d) two generally parallel supporting arms having their rear ends adapted to be pivotably attached to a vehicle,

(e) pivot means for pivotally interconnecting said two generally parallel supporting arms and said pair of fixed jaw members, so that said pair of fixed jaws can have limited pivotal movement about a horizontal axis,

(f) flexible interconnection means interconnected between said two generally parallel supporting arms and said pair of fixed jaw members which serves to limit the pivotal arc through which the fixed jaw members can pivot.

2. An improved tree cutting device including:

(a) a cutting blade,

(b) one end of said cutting blade being pivotably mounted with respect to a pair of fixed jaw members,

(c) fluid operated cylinder and piston means interconnecting said pair of jaw members and said cutting blade,

(d) said fixed jaw members being mounted for vertical pivotal movement about an elongated horizontally disposed beam, and said fixed jaw members being additionally connected to said elongated horizontally disposed beam by flexible interconnection means so that said fixed jaw members are free to move through a limited pivotal arc,

(e) two generally parallel supporting arms having their front ends attached to said beam and having their rear ends adapted to be pivotably attached to a vehicle, and

(f) means for raising and lowering said beam.

3. An improved tree cutting device according to claim 2, wherein said flex-

ible interconnection means comprises a cable.

4. An improved tree cutting device according to claim 2, wherein said flexible interconnection means comprises a chain.

5. A tree cutting device according to claim 2, wherein said means for raising and lowering said beam comprises a hydraulic cylinder and piston.

6. A tree cutting device according to claim 2, wherein said jaw members are provided with a plurality of teeth.

7. An improved tree cutting device according to claim 2, wherein said flexible interconnection means includes an upstanding post on said beam, a connection means on the top of said jaws, and a flexible element interconnecting said upstanding post and said connection means.

8. An improved tree cutting device according to claim 7, wherein said flexible element comprises a chain.

9. An improved tree cutting device according to claim 7, wherein said flexible element comprises a cable.

10. A tree cutting device according to claim 1, wherein said flexible interconnection means comprises an adjustable hydraulic cylinder.

### References Cited

#### UNITED STATES PATENTS

| | | | |
|---|---|---|---|
| 2,214,334 | 9/1940 | Knight | 144—34 |
| 2,529,934 | 11/1950 | Gracey et al. | 144—34 |
| 2,565,252 | 8/1951 | McFaull | 144—34 |
| 2,697,459 | 12/1954 | McFaull | 144—34 |
| 3,057,599 | 10/1962 | Clatterbuck | 144—34 |
| 3,110,477 | 11/1963 | Campbell | 144—34 |

WILLIAM W. DYER, Jr., *Primary Examiner*. W. D. BRAY, *Assistant Examiner*.