AMERACE CORPORATION, Plaintiff,

v.

FERRO CORPORATION, Defendant.

Civ. A. No. CA-3-79-1184-D.

United States District Court,
N. D. Texas,
Dallas Division.

Jan. 7, 1982.

**1190**

Ronald A. Sandler, Epton, Mullin, Segal & Druth, Ltd., Chicago, Ill., B. Thomas McElroy, McElroy & Boyd, Dallas, Tex., for plaintiff.

Eben G. Crawford, Squire, Sanders & Dempsey, Cleveland, Ohio, V. Brian Medlock, Richards, Harris & Medlock, Dallas, Tex., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ROBERT M. HILL, District Judge.

This cause came on for consideration before the Court without a jury on the liability issue only, the Honorable Robert M. Hill, United States District Judge, presiding. After considering all the evidence and the arguments of counsel the Court makes the following findings of fact and conclusions of law.

### Findings of Fact

1. The plaintiff, Amerace Corporation (Amerace), is a corporation organized under the laws of the State of Delaware and has its principal place of business in New York City, New York.

2. The defendant, Ferro Corporation (Ferro), is a corporation organized under the laws of the State of Ohio and has its principal place of business in Cleveland, Ohio. Ferro has a regular and established place of business in the Northern District of Texas.

3. This is an action for infringement of U.S. patent No. 3,332,327 ('327 patent), and specifically claims 1 and 13 of the '327 patent. The subject of the '327 patent is a pavement marker. Amerace is the owner of the '327 patent and it asserts that by manufacturing and selling pavement markers pursuant to Ferro's U.S. patent No. 4,076,383 ('383 patent), Ferro infringed the '327 patent both literally and under the doctrine of equivalents. Amerace seeks an injunction against further infringement at this time. Ferro denies infringement and counterclaims that in the event infringement is found, the '327 patent is invalid because it fails to adequately describe or claim the invention under 35 U.S.C. § 111 and § 112.

4. The subject of the '327 patent is a pavement marker which reflects a portion of a vehicle's headlight illumination back to

the operator of the vehicle. The marker functions primarily at nighttime.

5. The essence of the Amerace marker, as determined in *Amerace Esna Corp. v. Highway Safety Devices, Incorp.*, 330 F.Supp. 313 (N.D.Tex.1971), is a reflector system which resists optical deterioration arising out of the accumulation of light transmission impeding film from dirt, oil, etc., as well as mechanical abrasion by passing roadway traffic. This is accomplished by a plastic shell with a reflector system on the inside face together with an angle of the front face which is small enough to permit adequate wiping of the reflector's front face by contact with the tires of oncoming vehicles yet large enough to reduce optical deterioration of the front face resulting from abrasion of the face by contact with vehicle tires. To obtain optimum results with respect to optical effectiveness and adequate wiping, the front face should be angled at approximately 30°.

The reflective function of the marker is achieved by means of "cube corner" type reflector elements located on the inside face of the shell. Incident light, such as that from an approaching vehicle, is refracted at the inclined front face of the marker, and then reflected from the element's three faces thereby leaving the marker in a direction opposite from and generally parallel to its direction of incidence. This is known as "retroreflection." Figure 1 illustrates how triple mirror reflectors retroreflect incident light:

Figure 1

When a ray of incident light strikes one of three adjoining reflective faces (A) arranged at right angles to each other . . .

the ray is reflected to the second face (B) . . .

then to the third face (C) . . .

and returned to its source in a direction parallel to its original or direction of incidence.

6. Claim 1 of the '327 patent defines the basic structure of the marker as having a base to be affixed to the roadway with a body of light transmitting synthetic resin having reflective elements. The reflective elements have certain structural details for receiving incident light emanating from the source, e.g., headlights of a vehicle, and reflecting the light back toward the source so that the reflected light is generally parallel to the incident light. Claim 1 further specifies that the obverse or front face of the reflector body is positioned at a minimum angle of 15° relative to the associated base and roadway to maintain adequate optical effectiveness of the marker while allowing wiping of the front face by contact with the tire of an oncoming vehicle. The reflecting elements in Claim 1 are referred to as cube corner type reflecting elements and those elements are described as having three planar surfaces arranged mutually at right angles and meeting at a common point or apex remote from the obverse face to form a cube corner. An axis passes through the cube corner of each reflector element, the reflector elements being oriented such that each cube corner axis makes an acute angle with the normal (an imaginary line which is perpendicular to the front face) to the obverse face to align the cube corners to reflect the refracted light generally parallel to the direction of incident light. No specific shape or size is ascribed to the face of the reflector elements.

7. Claim 13 of the '327 patent specifies *inter alia* that the marker has a unitary molded shell of light transmitting synthetic resin of which the reflector portion is formed as a part thereof. The claim includes the limitation that there is a light reflecting material on at least the reflector portion and a filler material inside the shell. Claim 13 specifies a preferred front face angle of about 30° and a reflecting system which consists of a plurality or array of light reflecting elements each having three planar surfaces arranged mutually at right angles and meeting at a common point remote from the obverse face to form a cube corner. The axis which passes through the cube corner of each reflecting element is at an angle with the normal to the obverse face to allow the reflecting elements to receive light emanating in a generally horizontal direction from the oncoming vehicle and to reflect such light generally parallel to the direction of incidence.

8. On February 1, 1967, the Patent Examiner "rejected as indefinite" certain claims of the '327 patent application, which read in relevant part:

a triple mirror reflex reflecting system in said reverse [light receiving and reflecting] face.

Claim 5 of the patent application was accordingly amended and accepted by the Patent Examiner, and became Claim 1 of the '327 patent. The amendment specified:

a reflex reflecting system including a plurality of retrodirective reflector elements of the cube corner type in said reverse face for receiving light emanating from the vehicle and incident upon said obverse face in a generally horizontal direction of incidence and reflecting such light to return the light generally parallel to the direction of incidence.

Similarly, the Patent Examiner rejected the description in claim 5 of the patent application, which recited:

said acute angle being great enough to reduce optical deterioration of said obverse face arising out of contact with the oncoming vehicle while being small enough to allow adequate wiping of said obverse face by such contact . . . .

The Patent Examiner rejected this proposal because "the angle designated . . . is recited in terms of desired result and is objectionable." The inventor, Sidney Heenan, thereafter substituted the objectionable description with the following one:

said obverse face making an acute angle of at least 15° with the base to rise above the roadway surface upon which the pavement marker is to be installed for maintaining adequate optical effectiveness of the pavement marker during service while allowing wiping of said obverse face by contact with the oncoming vehicle . . . .

9. The '327 patent was issued on July 25, 1967. Several years later, this Court determined in a patent infringement suit brought by Amerace against a different defendant that the '327 patent is not obvious and is valid. *Amerace Esna Corp. v. Highway Safety Devices, Incorp.*, 330 F.Supp. 313 (N.D.Tex.1971).

10. After receiving its own patents, Ferro in 1979 began manufacturing and selling reflective pavement markers.

11. Amerace charges that the Ferro markers literally infringe Claim 1 and Claim 13 of the '327 patent. Claim 1 specifies:

In a pavement marker for providing a marking on a generally horizontally directed roadway surface, the marking being visible from an oncoming vehicle on the roadway:

a generally horizontal base adapted for engagement with said roadway surface;

a body of light transmitting synthetic resin having an outer surface including an obverse light receiving and refracting face and an inner surface including a reverse light receiving and reflecting face;

a reflex reflecting system including a plurality of retrodirective reflector elements of the cube corner type in said reverse face for receiving light emanating from the vehicle and incident upon said obverse face in a generally horizontal direction of incidence and reflecting such light to return the light generally parallel to the direction of incidence;

said obverse face making an acute angle of at least 15° with the base to rise above the roadway surface upon which the pavement marker is to be installed for maintaining adequate optical effectiveness of the pavement marker during service while allowing wiping of said obverse face by contact with the oncoming vehicle; and

each of said reflector elements having three planar surfaces arranged mutually at right angles and meeting at a common point remote from said ob-

verse face to form a cube corner, and an axis passing through the cube corner of each reflector element, said reflector elements being oriented such that each cube corner axis makes an acute angle with the normal to obverse face to align the cube corners relative to the light refracted as a result of the acute angle of the obverse face for receiving such refracted light and reflecting the refracted light to return the incident light generally parallel to the direction of incidence after refraction of the reflected light at the obverse face.

12. Ferro's accused marker embodies the following elements:

a. a horizontal base adapted for engagement with the road;

b. a body of light transmitting synthetic resin having an outer surface including an obverse light receiving and reflecting face;

c. a reflex reflecting system including a plurality of retrodirective reflector elements in said reverse face;

d. the obverse face making an acute angle of at least 15° with the base and rising above the roadway surface (specifically 33°);

e. each of the reflector elements has three planar surfaces arranged mutually at right angles which meet at a common point remote from the obverse face to form a cube corner; and

f. an axis passing through the cube corner of each reflector element, the axis being at an acute angle to the normal to the obverse face to align the reflector elements relative to the light refracted as a result of the acute angle of the obverse face for receiving the refracted light and reflecting the refracted light to return the incident light generally parallel to the direction of incidence.

13. Claim 13 of the '327 patent specifies:

a unitary molded shell of light transmitting synthetic resin material including a horizontal base for cooperatively engaging the roadway surface upon which the pavement marker is to be

installed, a generally horizontal top raised above said roadway surface, opposite faces interconnecting said base and said top transverse to the direction of the oncoming vehicle and opposite sides interconnecting said base, top and faces, the faces and sides sloping at an acute angle to the horizontal, said shell having an outer surface and an inner surface;

a generally planar obverse light receiving and refracting face upon the outer surface of at least one of said opposite faces, said obverse face being oriented at an acute angle of about 30° with the horizontal base;

a light receiving and reflecting face upon the inner surface reverse to said obverse face;

a plurality of light reflecting elements in said reverse face for effecting reflection of light impinging thereon from said obverse face, each said element having three planar surfaces arranged mutually at right angles and meeting at a common point remote from said obverse face to form a cube corner, the axis through the cube corner of each said reflecting element being at an angle with the normal to said obverse face for allowing said reflecting elements to receive light emanating in a generally horizontal direction from the oncoming vehicle and refracted by said obverse as a result of said acute angle of about 30° and to reflect such light generally parallel to the direction of incidence of said light upon said obverse face after refraction at said obverse face;

a light reflecting material upon at least a portion of the inner surface including the reverse face; and

a relatively rigid reinforcing material filling said shell between said top, base, opposite faces and opposite sides.

14. In addition to the elements of the Ferro marker stated in Finding of Fact 12 above, the Ferro marker has the following additional features:

a. a unitary molded shell;

b. a generally horizontal top raised above the roadway surface;

c. opposite faces interconnecting the base and top transverse to the direction of the oncoming vehicle and whose opposite sides interconnect the base, top, and faces;

d. a shell having an outer and inner surface;

e. a generally planar obverse face oriented at an acute angle of about 30° which receives and refracts light upon the outer surface of at least one of the opposite faces;

f. a light receiving and reflecting face upon the inner surface reverse to said obverse face;

g. a light reflecting material upon at least a portion of the inner surface;

h. a relatively rigid reinforcing material filling the shell.

15. The retrodirective reflector elements of the Ferro marker differ in two respects from those of the Amerace marker. First, Ferro utilizes a rectangular parallelepiped rather than the square structure employed by Amerace. In the Ferro marker, two of the three mutually perpendicular faces are rectangular; the remaining face is square. In the Amerace marker, all of the three mutually perpendicular faces are equal in length. Second, because the structure of the Ferro marker is rectangular, the axis passing through the apex, the point where the three planar surfaces intersect to form a corner, of the perpendicular faces has different qualities than the axis passing through the apex of the square faced structure of the Amerace marker. The axis in either structure may be called a "cube corner axis." In a square structure, such as utilized by Amerace, the cube corner axis lies along the same line as does the "trisector" of a square. The cube corner axis trisects the three planar surfaces in the same manner as does the "trisector" of a square such that the axis or imaginary line passes through the apex and forms an equal angle of 35° 16' with each of the three planar surfaces. The trisector of a square is also equivalent to the diagonal as well as

the "optical axis," which is an imaginary line through the apex of the three planar surfaces lying in the direction along which the maximum amount of light is intercepted and returned. In a rectangular structure, such as utilized by Ferro, the diagonal, but not the trisector, is equivalent to the optical axis. The diagonal of the rectangular parallelepiped, like the diagonal or trisector of a square structure, makes an angle of about 36° relative to the normal to the front face of the marker. The trisector of the rectangular parallelepiped is aligned approximately 13°–15° away from, instead of exactly parallel to, the refracted light. The trisector of Ferro's rectangular parallelepiped forms an acute angle of approximately 21° with the normal to the obverse face.[1] Figure 2 illustrates the angular relationships in a rectangular parallelepiped.

Figure 2

16. To obtain optimum retroreflectivity with either a square or rectangular structure, the apex or cube corner must be aimed such that the optical axis is generally aligned with the path of incident light or the refracted ray.

17. Both the Amerace and Ferro pavement markers are used in angled reflex applications in which the light receiving force, the front face of the marker, is not "straight on" or perpendicular to the incident light. The front face of the Amerace marker makes an angle of 30° with the base. Ferro first manufactured its marker with a front face angle of 47½°, which proved to be unsatisfactory. Ferro then changed the angle to 33°.

18. Although the front face of the reflector in the Amerace and Ferro marker is inclined relative to the horizontal incident ray, the axis passing through the apex of the three mutually perpendicular faces must be generally aligned relative to the refracted ray to optimize the optical efficiency of the reflector. Optimizing the retroreflectivity of the Amerace and Ferro markers can be accomplished by varying the "tilt" of the apex of the markers.[2]

1. The Pre-Trial Order, ¶ 14, states that the angle is 51° relative to the normal. This is evidently a typographical error and should read 21°. See Plaintiff's Exhibit 98, item 1.

2. Ferro's Proposed Finding of Fact 33 states that its retroreflective element retroreflects light "not by tilting the reflective element to obtain adequate reflectivity . . . but by scientif-

While the degree of the tilt differs for the two markers, the principle or goal of aligning the optical axis with the incident ray is the same for both the Amerace and Ferro markers. An imaginary Amerace cube corner type reflector element with all of the Amerace characteristics exists within each rectangular parallelepiped and the Amerace cube corner type element is an inherent limitation on Ferro's rectangular parallelepiped. Thus, the two markers are equivalent for they perform substantially the same function in substantially the same way to obtain substantially the same result.

19. Both the Amerace and Ferro pavement markers provide specific intensity values higher than the mimimum values required by the applicable Texas specifications and regulations, as well as those of other states.

20. At an entrance angle of 0°, there is no significant difference in reflectivity between the Amerace and Ferro markers. At entrance angles of 20° right and 20° left, the Ferro metallized reflector elements provide substantially greater reflectivity than the Amerace elements. While state specifications require evaluations to be made of specific intensity at entrance angles of 20° right and left, no competent data was presented which indicated why this measure was relevant or significant in any way with respect to the operation and function of the pavement markers.

21. The Amerace marker is a square marker which is molded as a full shell and requires an articulated mold in the manufacturing process. An articulated mold makes the marker's removal from the mold slightly more difficult than would an unarticulated mold.

22. The Amerace markers rely on an electroforming process, whereby a pin bundle of hexagonally shaped pins having square reflecting faces is used to make a negative reproduction of the triple mirror faces. This negative reproduction or "electroform" is then used as a mold into which

the reverse reflecting face of the reflector is formed by injection molding.

23. When electroforms are used for the molding process, as opposed to creating a molding directly from pins, "slippage" occurs. Slippage is the creation of nonreflective slip surfaces in the array of cube corner reflective elements which is caused by the inability of cube corner elements to properly stack or nest together when tilted to obtain maximum retroreflectivity. Slip surfaces cause shadowing, which hinders reflectivity at entrance angles other than 0°.

24. The Ferro marker is an octagonal marker which is molded as a half shell and does not require articulated molds. Unlike the Amerace marker, Ferro's octagonal marker cannot be manufactured as a full shell. In the Ferro molding process, the conventional hexagonal square faced metal pins are grinded down and modified so that they have the configuration of three adjacent faces of a rectangular parallelepiped. The pins are then assembled into bundles. The ends of these bundles may be used as a cast to directly mold the reflector element or an electroform of the pins may be made, and the mold can then be used to shape the reflector.

25. The unarticulated molds used by Ferro were not in any significant way more advantageous than the articulated molds used by Amerace. The slip surfaces resulting from Amerace's molding surfaces do not significantly detract from the reflectivity of its markers.

26. In 1976 Ferro entered into negotiations with the Rupert Manufacturing Company (Rupert) whereby Rupert would manufacture the shells for the Ferro marker. Rupert, a company similarly engaged in the retroreflector pavement marker business, agreed to manufacture the Ferro marker, but only if it received indemnification by Ferro for possible patent infringement of the '327 patent. Although Rupert typically requires indemnification protection from

---

ically dimensioning the three planar surfaces ... to allow ... alignment of each element so as to obtain optimal retroreflectivity ...."

The Court is of the opinion that this "scientific dimensioning" includes angling or tilting.

patent infringement when it does work for other companies, Rupert required a specific written indemnification of Ferro because Rupert became aware of specific potential patent infringement problems. After such indemnification was given, Rupert proceeded to manufacture the Ferro markers. The front face angle of the Rupert marker was 47%p1/2°, and it did not perform adequately.

27. Officers of Ferro and Amerace met on March 10, 1977, for the purpose of discussing Ferro's request that Amerace issue it a license for the manufacture of pavement markers. Amerace refused to grant Ferro a license.

28. Ferro received a patent on its marker in 1978.

29. Dissatisfied with the performance of the Rupert marker, Ferro entered into an agreement with the Grote Manufacturing Company (Grote). After receiving its requested indemnification, Grote began to manufacture the Ferro markers in 1979. Grote has continued to manufacture Ferro markers with a front face angle of 33°.

### Conclusions of Law

#### I. Jurisdiction

1. This Court has jurisdiction of the subject matter of this action pursuant to 28 U.S.C. § 1338, and by virtue of Ferro's amended counterclaim, 28 U.S.C. §§ 2201 and 2202. Venue is properly laid in this district pursuant to 28 U.S.C. § 1338(a) and § 1400(b). Amerace has the entire right, title, and interest in and to the '327 patent, together with the right to bring and maintain a suit for any and all past and future infringement.

#### II. Literal Infringement

■ 2. The Court notes at the outset that there are many unique angles in the present controversy on which the parties have gone to great degrees to develop. Prior decisions involving patent infringement are almost completely dependent on the facts and technological niceties unique to the particular patent at issue. Thus, legal precedent is generally helpful only insofar as legal principles of infringement are established, to which the particular facts of the present action may be applied. The Fifth Circuit has established that infringement of a patent will be found only if the accused device is substantially identical in structure, mode of operation, and results accomplished to the allegedly infringed device. *Marvin Glass & Assoc. v. Sears, Roebuck & Co.*, 448 F.2d 60 (5th Cir. 1971); *Stewart-Warner Corp. v. Lone Star Gas Co.*, 195 F.2d 645 (5th Cir. 1952). Courts address this general question of infringement by first inquiring whether the accused device literally infringes the patent in question. If not, the court will consider whether infringement nonetheless exists under the doctrine of equivalents. *Ziegler v. Phillips Petroleum Co.*, 483 F.2d 858, 868 (5th Cir.), cert. denied, 414 U.S. 1079, 94 S.Ct. 597, 38 L.Ed.2d 485 (1973). Plaintiff Amerace has the burden of proof on the issue of infringement. *Foster Cathead Co. v. Hasha*, 382 F.2d 761 (5th Cir. 1967), cert. denied, 390 U.S. 906, 88 S.Ct. 819, 19 L.Ed.2d 872 (1968); *Amerace Esna Corp. v. Highway Safety Devices, Incorp.*, 330 F.Supp. 313.

■ 3. Proving a case of literal infringement is a particularly difficult task for a plaintiff who is relying on a combination patent, for all elements of plaintiff's claim must be embodied in the infringing device to establish literal infringement. *Marvin Glass, supra; Banning v. Southwestern Bell Telephone Co.*, 384 F.Supp. 831 (S.D.Tex.1974). A combination patent is one in which all of the individual elements are old and the asserted novelty resides in the combination of those elements. *Rountree v. Varco Int'l, Inc.*, 487 F.Supp. 3, 4 (S.D.Tex.1978), aff'd 618 F.2d 1183 (5th Cir. 1980). Patents on a single combination of known elements are difficult to obtain and they are not easily infringed. *Id.*

4. It is unclear whether the '327 patent is a combination patent. While the parties have suggested this is a combination patent, the Court in an unrelated suit found that there was a "new feature" in the '327 patent which distinguished it from prior art and made the structure patentable. This new feature is "utilization of the front face angled to obtain maximum reflection and

optimum efficiency to withstand the effects of dirt and abrasion." *Amerace Esna Corp.,* 330 F.Supp. 313, 318. Whether or not the '327 patent is a combination patent, the test for literal infringement is nonetheless very strict, and the Court's conclusion that there is no literal infringement is the same in either event.

5. Amerace has attempted to prove that Claims 1 and 13 of the '327 patent read literally on Ferro's marker. To establish literal infringement, the claims of the patent must be closely analyzed, for the scope of the patent is limited to the invention described in its claims, in conjunction with the patent's specifications. *Ziegler,* 483 F.2d 858, 868. Thus, neither the claims nor the specifications alone are independently determinative of the infringement issue. It is "well settled that merely because the claims in suit taken literally read element by element on the accused device[,] [this fact] does not establish infringement, nor does it establish a presumption of infringement." *Foster Cathead Co.,* 382 F.2d 761, 765, *citing* Pigott, *Equivalents in Reverse,* 43 J.Pat.Off.Soc'y 291–92 (1966). Rather, the claim must be viewed in light of the invention disclosed and "cannot be given a construction broader than the teachings of the patent as shown by the drawings and specifications." *Marvin Glass,* 448 F.2d 60, 62, *citing United States Industries, Inc. v. Otis Engineering Corp.,* 254 F.2d 198, 201 (5th Cir. 1958). These principles indicate the factors which must be considered in order to define the scope of the patent in question and how the patent is to be construed. Once the bounds of the patent have been so delineated, the question of literal infringement may be addressed. In resolving this question, the Supreme Court has held that after resort to the words of the claim has been made, "[i]f accused matter falls clearly within the claim, infringement

is made out and that is the end of it." 483 F.2d 858. *Graver Tank & Mfg. Co., Inc. v. Linde Air Products, Inc.,* 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950). Once the higher threshold for literal infringement has been met, however, the lower threshold for general infringement requiring substantial identity in structure, mode of operation and results accomplished likewise must be satisfied. *See Ziegler,* 483 F.2d 858, 868; *see also Williams Bit & Tool Co. v. Christensen Diamond Products Co.,* 399 F.2d 628 (5th Cir. 1968); *Texstream Corp. v. Blanchard,* 352 F.2d 983 (5th Cir. 1965), *cert. denied,* 387 U.S. 936, 87 S.Ct. 2064, 18 L.Ed.2d 1000 (1967).

6. Much of the testimony at trial focused on the definition of "cube corner" and what was intended by the reference in the '327 patent to the "cube corner axis," which is an axis passing through the cube corner. The Court is of the opinion that for purposes of literal infringement, the definition of a cube corner axis cannot be determinative. For one thing, Amerace did not meet its burden of establishing that the cube corner axis can only mean the optical axis or body diagonal, and not the trisector.[3] Thus, the accused matter does not fall *clearly* within the claim. Perhaps more importantly, the *structure* of the Amerace marker, as evidenced by the drawings in the '327 patent, is not identical to the structure of the Ferro marker. Thus, that it is possible to read the elements of Claims 1 and 13 onto the Ferro marker does not negate the fact that the '327 patent is directed to a marker constructed of mutually perpendicular square faces. In contrast, Ferro's markers have rectangular faces and reflective elements in which the optical axis is not equivalent to the trisector.

**3.** In Plaintiff's Proposed Findings of Fact 31, Amerace contends that even when cube corner axis is construed to mean "only that line which is equiangularly positioned relative to the three mutually perpendicular faces of the reflecting elements" (the trisector), there is literal infringement. According to Amerace, this is because the trisector of the Ferro marker would be "generally parallel to the direction of inci-

dent light," thereby satisfying the underlying goal of the marker's optical function, and this trisector is at an angle of about 21° to the normal to the obverse face, which is an "acute angle" as specified in Claims 1 and 13. The Court nonetheless is of the opinion that the structures of the two markers are different, as discussed *infra,* and thus there can be no literal infringement.

■ 7. In *Stewart-Warner Corp., supra,* the Fifth Circuit concluded that plaintiff's symetrically designed gas heater was substantially different in physical structure from defendant's asymetrically designed heater, which precluded a finding of literal infringement. More recently, the Fifth Circuit concluded in *Weidman Metal Masters v. Glass Master Corp.,* 623 F.2d 1024 (5th Cir. 1980), *cert. denied,* 450 U.S. 982, 101 S.Ct. 1519, 67 L.Ed.2d 817 (1981), that literal infringement may be avoided by minor modifications. In *Weidman,* the accused device avoided literal infringement by the mere transposition of parts which performed an identical function as the alleged infringed device. This minor modification, however, did not avoid a finding of infringement under the doctrine of equivalents. *Id.* at 1029. *See Continental Oil Co. v. Cole,* 634 F.2d 188 (5th Cir. 1981); *see also Central Soya Co. Inc. v. Geo. A. Hormel & Co.,* 645 F.2d 847 (10th Cir. 1981), wherein the Tenth Circuit held that a mere difference in the amount of compression applied in the manufacture of pork fritters would avoid literal infringement but not infringement by equivalents. Drawing on the parallel situations in these decisions, the Court is of the opinion that because such modifications exist between Amerace's square reflector elements in which the trisector, body diagonal, and optical axis are all equivalent and Ferro's rectangular parallelepiped in which the trisector is not equivalent to the body diagonal or optical axis, the Ferro marker cannot be said to literally infringe Claims 1 and 13 of the '327 patent.

### III. File Wrapper Estoppel

■ 8. When a patent applicant limits his patent claims to induce the Patent Examiner to allow the claims over the prior art, the doctrine of file wrapper estoppel prevents the applicant from subsequently attempting to recapture those limitations by seeking a broader construction of his claim through the doctrine of equivalents. *Banning,* 384 F.Supp. 831, 838. File wrapper estoppel operates whether the limitations are inserted by amendment or whether narrow claims are accepted after broader claims are rejected. *Id.* Thus, the construction of an invention is based on its claims together with the file wrapper, which contains the complete Patent Office file of papers on the patent. *Ziegler,* 483 F.2d 858, 870.

9. Ferro contends that Amerace is precluded from asserting the doctrine of equivalents because the doctrine of file wrapper estoppel is triggered by the Patent Examiner's rejection of the '327 patent application's characterization of the reflector element as a "triple mirror reflex reflecting system." Ferro posits that the amended description, a "cube corner type," together with the statement made by the applicant's attorney in the Remarks Section of the amended patent application that the new designation "more clearly sets forth the particular reflex reflecting system which is a part of the combination claimed," operate to estop Amerace from broadening its patented pavement marker to a non-square reflector element in which the trisector is not equivalent to the optical axis. The doctrine of file wrapper estoppel has itself been limited, and the Court is of the opinion that the doctrine does not operate in the particular circumstances to bar the application of the doctrine of equivalents.

■ 10. The Fifth Circuit recently considered the scope of the file wrapper estoppel doctrine in *Continental Oil,* 634 F.2d at 188. It is noteworthy that the Fifth Circuit considered the applicability of file wrapper estoppel *after* it considered the far reaching protection a patent is entitled to under the doctrine of equivalents, *see id.* at 198, as opposed to using file wrapper estoppel as a device by which consideration of the doctrine of equivalents is not reached. *See, e.g., Rountree,* 487 F.Supp. 3; *Banning,* 384 F.Supp. 831. In *Continental Oil,* the court found that the disclaimer under the circumstances would not automatically estop the plaintiff from asserting that which it had previously "surrendered." The court held that a patent applicant is not presumed to have narrowed his claim more than was necessary to satisfy the Patent Office's challenge. In addition, the nature of the invention was such that it was entitled to a

**1200**

broad degree of protection under the doctrine of equivalents. Moreover, there was no evidence in the file history that the patent application was amended because of the Patent Office's rejection based on prior art. 634 F.2d 188, 198–99. This holding is related to the rule that file wrapper estoppel does not apply where an amendment is made for purposes of *clarification. Central Soya Co. v. Geo. A. Hormel & Co.*, 645 F.2d 847, 851 (10th Cir. 1981); *Speed Shore Corp. v. Denda*, 605 F.2d 469, 472 n.6 (9th Cir. 1979).

█ 11. Utilizing these criteria, it is clear that file wrapper estoppel is not applicable in the present action. The language of the substituted amendments does not suggest that the patented marker was limited to a square reflector element in which the cube corner axis was required to be equivalent to a trisector. The amendments served to make the claims throughout the application uniform by the use of the term "cube corner." More importantly, the amendments more clearly described the structure: the marker is comprised of an array or "plurality" of reflector elements, all of which have mutually perpendicular faces and are angled or oriented in relation to the axis which passes through the apex of the corner of the mutually perpendicular surfaces such that an acute angle is formed with the normal in order for light to be refracted parallel to the incident ray. The relevant section of the original claim was rejected, not because it was unpatentable based on prior art, but because it was "indefinite" and "not sufficiently descriptive of the structure." Furthermore, the '327 patent, while not rising to the level of a "pioneer patent," was demonstrated to be more than a "mere improvement or perfection of what had gone before," *Continental Oil*, 634 F.2d 188, 198–99 n.7, and is accordingly deserving of meaningful protection. *Id.* at 198. Thus, file wrapper estoppel does not bar Amerace from claiming infringement under the doctrine of equivalents.

IV. Doctrine of Equivalents

█ 12. The doctrine of equivalents is an attempt to balance the protection to be given the inventor against the need for creativity by others working in the field. While a "patentee is entitled to protection against parties who make minor changes in his invention . . . a patent does not give an individual unlimited protection against every conceivable item which may employ some elements of the teaching of the patent." *Studiengesellschaft Kohle v. Eastman Kodak Co.*, 616 F.2d 1315, 1340–41 (5th Cir.), *cert. denied*, 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980). The Supreme Court provided a framework for determining equivalency in *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950), wherein the Court stated:

What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not require complete identity for every purpose in every respect. In determining equivalents, things equal to the same thing may not be equal to each other and, by the same token, things for most purposes different may sometimes be equivalents. Consideration must be given to the purpose for which an ingredient is used in a patent, the equalities it has when combined with the other ingredients, and the function which it is intended to perform.

*Id.* at 609, 70 S.Ct. at 856. Thus, the liberal construction warranted by the doctrine of equivalents is in contrast to the "strictissimi interpretation" followed in a literal infringement analysis. *Continental Oil*, 634 F.2d 188, 197. This is because if patents were interpreted only by the literal scope of their claims, "minor deviations in the structure of almost any invention could be devised to elude the reach of the patent's protection." *Ziegler*, 483 F.2d 858, 868.

█ 13. The patentee has the burden of establishing equivalents by demonstrating a real identity of means, operation, and result. The standard inquiry is whether the alleged infringer's alterations result in a device that appropriates the invention and incorporates its innovative concept into a

device that performs "substantially the same function in substantially the same way to obtain substantially the same result." *Weidman Metal Masters*, 623 F.2d 1024, 1026; *Continental Oil*, 634 F.2d 199; *Foster Cathead*, 382 F.2d 761. In *Weidman*, the Fifth Circuit examined two devices used to cut grooves in a duct board which is used in the formation of air ducts for air conditioning and heating systems. The court found that the patent claim called for resiliency during the cutting process while the alleged infringing device did not provide for resiliency; this difference precluded literal infringement. This difference, along with another in which the position of the knife blade was moved from behind to above the guide roller, and thereby resulting in a "slight repositioning of an element of combination and the ... acceptance of a slightly less efficient job," *id.* at 1029, did not prevent a finding of infringement by equivalents. Although the court acknowledged that the distinctions between the two devices were not insubstantial, it concluded nonetheless that the operation and results achieved by the two devices were essentially the same.

14. Realizing that a court's task in infringement litigation "of discerning reticent dissimilarities is as imperative as noting the more visible sensibilities," and after "wading through a maze of insensate semantics," *Continental Oil*, 634 F.2d 188, 193, the Court is of the opinion that a substantial identity likewise exists in the present action between the two markers. The reflector elements in both markers utilize mutually perpendicular faces which are positioned such that incident light is refracted at the inclined front face of the marker and is then internally reflected from these faces and subsequently refracted at the front face so that the light leaves the marker in a direction opposite and generally parallel to the angle of incidence; both markers have a horizontal base, a light transmitting shell, and an obverse face whose angle is approximately 30°; while the rectangular structure of the Ferro marker allows for differences in the molding and manufacturing process, the rectangular parallelepiped and the accompanying implications with respect

to its trisector utilize the same principles of optics as does the Amerace marker; and, by generally aligning the optical axis with the refracted ray, both the Amerace and Ferro markers utilize substantially the same elements in substantially the same way to achieve substantially the same function and results. The Ferro marker infringes the '327 patent under the doctrine of equivalents.

15. The holding that there is infringement under the doctrine of equivalents is not mitigated by Ferro's attempt to demonstrate that its markers escape infringement because they are a significant improvement upon the Amerace markers. It is well settled that an improver cannot appropriate the basic patent of another and an improvement of a patented article does not excuse infringement of the dominant patent. *Ziegler*, 483 F.2d 858, 871. Moreover, one who appropriates the substance of a patented invention without the consent of the patentee does not escape infringement by improving upon or subtracting from the invention so long as the essential elements are retained. *Id.* Thus, as a matter of law, an improvement in the Amerace marker would not be determinative in this action. In addition, the Court is of the opinion that even if a defense to infringement was available based on Ferro's improvements, Ferro has not demonstrated that its markers are a significant improvement over the Amerace markers. The only improvement which is relevant with respect to Claims 1 and 13 is that the Ferro marker is more reflective at entrance angles of 20°; this photometric measure, however, was not shown to have any significant bearing on the reflective capacity of the marker as a whole. Both the Ferro and Amerace markers surpass state minimum requirements, and the Ferro marker has not been shown to surpass the Amerace marker in its overall effectiveness.

### V. Validity of the '327 Patent

16. Ferro contends that in the event infringement is found, the '327 patent is invalid under 35 U.S.C. § 112 for failure to sufficiently disclose the details of the pat-

ented invention so that the public and those skilled in the art may be reasonably apprised of the patent's coverage. Section 112 provides in relevant part:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most clearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

17. When questions of infringement and patent validity are raised, "validity has the greater public importance." *Sinclair & Carroll Co. v. Interchemical Corp.*, 325 U.S. 327, 330, 65 S.Ct. 1143, 1145, 89 L.Ed. 1644 (1945). This Court has already determined that the '327 patent is valid on the basis that it embodies new features which distinguish the invention from prior art. *Amerace Esna Corp.*, 330 F.Supp. 313, 318. The prior decision does not, however, address the adequacy of the patent claims' disclosures and that issue must now be considered in light of the evidence produced at trial.

18. It has been held that an inventor's decision to manufacture and market an embodiment of his invention does not limit the patent to that embodiment. *Velo-Bind, Inc. v. Minnesota Mining & Mfg. Co.*, 647 F.2d 965, 969 (9th Cir. 1981). The Fifth Circuit has not construed 35 U.S.C. § 112 as requiring the patentee to spell out in the patent claims every possible example of the manufacture and use of the invention; rather, the patentee is to set forth the best mode contemplated and often the patent claims are not restricted to the best mode of carrying out the invention. *Ziegler*, 483 F.2d 858, 871. Whether the "cube corner type" phraseology is narrowly construed to require a "pure" cube structure in which all the faces of the reflector element are equal in size or more broadly construed to cover reflector elements in which all the faces are not equal in size (e.g., a rectangle), the teaching of the "best mode" of the invention is that the front face of the pavement marker should be angled at 30° to the horizontal and that the optic axis be generally aligned with the refracted ray.

19. The "semantics battle" between the parties over the meaning of a cube corner type reflector and cube corner axis is relevant, if at all, with respect to the issue of the validity, as opposed to the literal infringement, of the '327 patent. With respect to literal infringement, Amerace did not carry its burden of demonstrating that "cube corner axis" is not the trisector of the structure. To establish invalidity of the '327 patent, however, Ferro now bears the burden of proof under 35 U.S.C.A. § 282, and a presumption of validity attaches to patents that have survived the scrutiny of the Patent Office. *Beckman Instruments, Inc. v. Chemtronics, Inc.*, 428 F.2d 555, 560 (5th Cir.), *cert. denied*, 400 U.S. 956, 91 S.Ct. 353, 27 L.Ed.2d 264 (1970); *Continental Oil*, 634 F.2d 188. Moreover, the burden of establishing patent invalidity requires more than a mere preponderance of the evidence. *John Zink Co. v. Nat'l Airoil Burner Co.*, 613 F.2d 547, 551 (5th Cir. 1980). Ferro has failed to meet this stringent burden by establishing that a cube corner type reflector and cube corner axis are limited to square structures in which the axis is a trisector.

20. A "patent is to be construed as a contract with the intent of the parties as the lodestar. It is the real invention claimed and granted protection which we seek to determine." *Weidman Metal Masters*, 623 F.2d 1024, 1029. Amerace demonstrated that at the time the '327 patent was issued, the term "cube corner type reflector" was interpreted by those in the trade rather broadly, and connoted not a "pure" cube with square faces but a retroreflector consisting of three mutually perpendicular surfaces which operate to reflect incident light in a direction generally parallel to its source. While the Court is aware of at least one decision requiring that words used

in a patent be given their ordinary and accustomed meaning, *Harrington Mfg. Co. v. White*, 323 F.Supp. 1345, 1353 (N.D.Fl. 1971), *rev'd.* 475 F.2d 788 (5th Cir.), *cert. denied*, 414 U.S. 1040, 94 S.Ct. 542, 38 L.Ed.2d 331 (1973),[4] the Court is also cautious about construing the instant patent claims such that it would cause the patent to mean one thing at the time of issuance and another at a later date, *Swift Chemical Co. v. Usamex Fertilizers, Inc.*, 490 F.Supp. 1343 (E.D.La.1980), *aff'd* 646 F.2d 1121 (5th Cir. 1981).

21. One additional factor, albeit not determinative, supports the Court's holding that the '327 patent is not invalid for insufficient disclosure to those skilled in the art. Rupert and Grote, the two companies with which Ferro entered into agreements concerning the manufacture of its markers, insisted on indemnification because of the possibility of infringing the '327 patent. In addition, Ferro itself sought a license from Amerace. These facts suggest that it was not atypical or unreasonable for those in the trade to construe "cube corner" broadly enough to include rectangular structures. The Court is of the opinion that the '327 patent made a sufficient disclosure to enable those skilled in the art to make and use the invention and that the '327 patent is not invalid by reason of being violative of 35 U.S.C. § 112.

## VI. Conclusion

22. The Court thus concludes that Ferro infringed the Amerace '327 patent. While the Ferro marker does not literally infringe the Amerace marker, the two markers are sufficiently alike in means, operation, and result to find infringement under the doctrine of equivalents. Ferro has not demonstrated that Amerace is precluded by file wrapper estoppel from asserting infringement by equivalents. Moreover, the '327 patent is valid and adequately disclosed the invention to Ferro and others skilled in the art. Accordingly, Amerace is entitled to a declaratory judgment that Ferro has infringed its patent. Amerace is also entitled to an injunction against the further manufacture and sale of Ferro's markers.

23. The issue of damages having been reserved for separate trial, the Court sets the trial date for this issue on May 17, 1982, unless the parties can agree with respect thereto.

---

**4.** As counsel for Amerace has indicated, the term "cube" is often used in ordinary language in a broader context; for example, an "ice cube" does not connote an equal sided figure. Moreover, the *Harrington* trial court noted that an exception to its general rule is warranted where it specifically appears from the patent that the inventor attached a different meaning to the term in question. 323 F.Supp. 1345, 1353. It should be further noted that in *Harrington*, the court's task was to construe the term "flexible." The court opted for the customary definition of the term, in contrast to the proffered alternative construction, which had the effect of expanding a "flexible interconnection" to encompass a "rigid" structure, a term which is completely "antithetical" to the term in issue. *Id.* at 1354. In contrast to *Harrington*, construing the '327 patent to include a rectangular parallelepiped does not require the adoption of a definition which is antithetical to "cube." It is also significant that the Fifth Circuit reversed the trial court for it found that when read in light of the purpose and function of the device in question, the term "flexible" could in fact be construed to encompass the "antithetical" function. The Fifth Circuit cautioned against undermining the rights of patentees on the basis of "semantical facades." 475 F.2d 788, 801.